[No. 8344. Department Two. September 20, 1910.]

STEPHEN H. C. MINER, *Plaintiff*, v. ANNA K. PAULSON *et al.*, *Appellants*, DANIEL SHULTS, *Respondent*.[1]

DEPOSITIONS—RIGHT TO USE—PLEADINGS — AMENDMENTS — WITNESSES—CROSS-EXAMINATION. A deposition taken on behalf of defendant before his answer was amended is admissible in evidence, where the facts alleged in the amended answer are substantially the same; since, under the code, amendments are almost a matter of course at any stage of the proceedings, and cross-examination is not confined strictly to the issues.

EVIDENCE—PAROL EVIDENCE TO VARY WRITING—FRAUD. Parol evidence is admissible to show that a written agreement for the sale of corporate stock did not express the true contract between the parties, where part of the shares were only assigned temporarily for voting purposes, in fraud of the rights of one of the owners, who was not notified and was thereby deprived of their use, although the purchaser intended no ultimate fraud and was willing to reassign the stock.

FRAUD—PLEADING. Fraud need not be alleged in direct terms, it being sufficient if the facts constituting the fraud are set forth.

TRUSTS—DECLARATION OF TRUST. Where the purchaser of corporate stock acknowledged in a letter that part of the stock was to be reassigned to the owners, the letter did not amount to a declaration that the purchaser held the stock in trust for the person to whom the letter was written, where such person only had a half interest therein and desired to defraud his co-owner out of the other half interest.

COMPROMISE AND SETTLEMENT—FRAUDULENT CONCEALMENT. An agreement settling the rights of the parties in and to all the stock of a corporation does not include an interest which one of the parties had fraudulently concealed from the other party to his prejudice without fault or negligence on the part of the latter.

Appeal from a judgment of the superior court for Spokane county, Kennan, J., entered February 6, 1909, upon findings adjudging the conflicting claims of defendants to shares of corporate stock, after a trial on the merits before the court without a jury, in an action of interpleader. Affirmed.

[1]Reported in 110 Pac. 994.

*Post, Avery & Higgins, Happy & Hindman,* and *Turner & Geraghty,* for appellants.

*Voorhees & Voorhees* and *Graves, Kizer & Graves,* for respondent.

FULLERTON, J.—This proceeding was begun by Stephen H. C. Miner, as plaintiff, against the appellants, Paul A. Paulson and Anna K. Paulson, and the respondent, Daniel Shults, as defendants, as an action of interpleader under the code. The plaintiff having in his possession 200,000 shares of the capital stock of the International Coal & Coke Company, and certain moneys paid thereon as dividends, deposited the same with the clerk of the superior court of the county of Spokane, averring in his complaint of interpleader that he disclaimed any interest in the property himself; that the appellant Anna K. Paulson claimed to be the sole owner of the whole thereof; that the respondent, Daniel Shults, claimed to be the owner of a one-half interest therein, and that the appellant Paul A. Paulson claimed some interest the nature of which he was unable to set forth, and praying that the conflicting claims of the several defendants be determined and adjudicated by the court. In answer to the complaint, all of the defendants appeared; the appellants setting up title to the whole of the property in Paul A. Paulson, and the respondent setting up title in one-half thereof in himself. On the issues thus made a trial was had, resulting in a judgment awarding one-half the property to the respondent, Shults. From the judgment entered, this appeal was taken.

The facts giving rise to the controversy are somewhat complicated. The record discloses that sometime in 1902 the defendants acquired certain coal properties situated in the province of Canada, which they deemed of value and which they desired to develop. The title to the property was taken in the name of the respondent, Shults, who thereupon entered into an agreement with the appellant Anna K. Paulson to the effect that he held the same in trust for himself and Anna K.

Paulson jointly, subject to certain limitations and agreements therein set out. Among other things, it was agreed that a corporation should be organized under the laws of the state of Washington, to be known as the International Coal & Coke Company, Limited, with a capital stock of $3,000,000, divided into 3,000,000 shares of the par value of $1 each, to which corporation the respondent, Shults, should convey the coal lands before mentioned. The contract also contained provisions for setting apart a certain number of shares as treasury shares, to be under the control of the corporation and sold for development purposes, for the sale of certain others to procure funds to meet certain payments, and that when these payments were made, the remaining shares should be divided equally between Anna K. Paulson and the respondent, Shults. The agreement was executed March 29, 1902, and was carried out in so far as to organize a corporation and convey to it the coal lands, but the parties seem not to have been able to sell any of the corporate stock, at least none of it was sold prior to the month of December, 1902, at which time the parties succeeded in interesting the plaintiff, Miner, in the enterprise.

On the eighth day of that month the parties entered into a written contract with Miner, one Alfred C. Flumerfelt, the agent of Miner, being named therein as principal, whereby Miner undertook, in consideration of the assignment of 1,400,000 shares of the capital stock of the corporation to Flumerfelt, to pay into the treasury of the corporation at certain times and on certain conditions (not necessary to recite here) the sum of $120,000 to be used in the development of the properties. There was also executed at the same time another writing, in which the parties agreed to deposit with Flumerfelt 700,000 additional shares of the capital stock of the corporation to be held by him in trust for a period of five years, with power to vote the same at all stockholders meetings, the purpose of this being to give to Miner control over the corporation for that period of time. Shortly there-

after the Paulsons and Shults assigned to Flumerfelt the shares of stock mentioned in the first contract from shares held by themselves in equal amounts; that is to say, the Paulsons furnished one-half of the required number and Shults one-half. The second number were furnished in unequal proportions, the Paulsons putting up the greater part. Thereafter Miner carried out his part of the contract, paying into the corporation the sum of money agreed upon, and thereby becoming entitled to the full legal and equitable title to the shares of stock to which he was to become the owner by virtue of the first mentioned agreement.

The writing evidencing the first mentioned agreement seems not to have correctly recorded the agreement that was actually entered into. At the time Miner decided to make an investment in the coal properties he was at Montreal, Canada, and telegraphed from that place to Paul K. Paulson at Spokane, Washington, requesting Paulson to meet him at the former city for consultation. Paulson met him as requested, and an agreement was concluded between them substantially as recorded in the writing, with the exception that Miner was to receive for his investment 1,200,000 shares of the capital stock of the corporation, instead of 1,400,000 shares as was subsequently stated in the writing. The additional 200,000 shares were added at the request of Paulson.

After the contract had been substantially agreed upon on a basis of 1,200,000 shares, Paulson stated to Miner that he desired that the contract when written be made to include 200,000 shares in addition to the number agreed upon, to be held by Miner until the enterprise should be fairly under way, when he desired them to be reassigned to him. Miner, knowing that one-half the number of shares agreed to be assigned him belonged to the respondent, Shults, whom Paulson represented by power of attorney, demurred to the proposal at first, but finally consented to take an assignment of the stock on condition that Shults be sent for and the contract be executed by him in person. Shults was thereupon telegraphed

for, but before he arrived Miner had left Montreal for some point in the United States, leaving the business in charge of his agent, Flumerfelt. On the arrival of Shults at Montreal he was met by Paulson, who purported to make known to him the terms of the contract, stating the terms with substantial accuracy, with the exception of the number of shares Miner desired assigned to him in consideration of his financing the enterprise, stating that the number of shares to be assigned was 1,400,000, but omitting to state that 200,000 such shares were to be reassigned to him. Shults, believing that the contract as stated by Paulson represented the true agreement, consented thereto, whereupon the terms of the contract were reduced to writing and duly executed.

After the execution of the contract, Miner credited Paulson upon his books with 200,000 shares of the capital stock of the corporation, and in answer to one of Paulson's demands for a reassignment of the stock, wrote him the following letter:

"January 11, 1905.

"Mr. P. A. Paulson—Dear Sir: Your lawyer's letter to me is a thing to make one laugh, and has no effect, as the letter is filled with misstatements from end to end. The facts are these. I have the stock, which Mr. Flumerfelt placed in my hands, intended to be handed over to Mr. Paulson when certain conditions had been complied with. Whether these conditions are all complied with or not, I do not know, as Mr. Flumerfelt has not mentioned the matter to me for many months. One condition I do know is that I was to hand this stock over at my option, for the purpose of control. I had the right to hold said stock in my name, you also pooled a large lot with Mr. Flumerfelt for a term of years for the same purpose. Now then, came severe litigation from other parties, laying claim to your stocks, and in my endeavor to help you, tried very hard to have you settle with all fairly and squarely which you could have done, but you would not hear to anything of the kind, and the consequence is, that you are fleeced of all the stock you had, when you could have saved probably half of it. Now, as this stock was and is, entirely in my hands, and subject to my option, I thought

best not to promise anything to anybody, until you were clear of what seemed to be many sharp practices. But after the conversation had with you at Grand Forks, on my return at once had placed to the credit of Mrs. Paulson, or Mr. Paulson, the shares in question to be delivered when the pooling arrangement whatever it was with Mr. Flumerfelt ran out, and there they stand since last August. Thinking from what you stated that all possible litigation had ceased. Now, lastly, when your last letter was forwarded, I was in the United States for some time, and on my return was just on the point of writing you these facts when I saw by the Spokane papers that you were having another suit, from another claimant, and thought best to wait until some decision was given in the matter, and as I have not heard, consequently have not written, and being away from home so much, the matter went out of my mind. Now, I simply have this to say, that I shall not trouble myself any more about this whole matter. I have acted so as to protect you in a straight-forward way, but it seems as if you were ever itching for litigation by the way you write me. I should think you had got enough of it by this time. I do not lay claim to this stock today, any more than to have it lay in my hands, and name, until the pooling time expires. Any dividends accruing in the meantime belong to the stock and would be paid over to you, but now as I make this statement definitely, the stock is open to seizure by anyone getting a trumped up claim against you. I am sorry for you, and more sorry for your stupidity.
"Very truly yours,          S. H. C. Miner."

Some time in the year 1903, one O. G. Labaree brought an action against the Paulsons and Shults in which he claimed 225,000 shares as a commission for negotiating the deal that was made by the Paulsons and Shults with Miner, and later on, the Paulsons brought an action against Shults to recover from him a large number of shares which they claimed belonged to Anna K. Paulson and which Shults was wrongfully withholding. These actions were subsequently settled, the Paulsons and Shults entering into the following agreement:

"This memorandum of agreement, made and entered into this 18th day of July, 1904, by and between Anna K. Paul-

son and P. A. Paulson, parties of the first part, and Daniel Shults, party of the second part, witnesseth,

"That, in consideration of the mutual promises herein, the parties hereto agree as follows: That the second party, out of all the stock owned or claimed by each and both parties hereto in the International Coal & Coke Company, Limited, shall retain and own, free from any claim or right of first parties, two hundred and twenty-five thousand (225,000) shares, and free from the claims hereinafter referred to which are to be paid as herein provided.

"That after one hundred and seventy-five thousand (175,-000) shares of stock in said company are paid to O. G. Labaree, in settlement of his suit against the parties hereto out of the certificate of stock for 339,287 shares, being certificate No. 15, standing in the name of second party, and 111,191 shares are paid therefrom to the other claimants who are specified in the answer of second party of the suit between him and first parties now pending, the remaining shares in said certificate shall be divided equally between the parties hereto—that is, one-half of such balance to second party, to constitute a part of said 225,000 shares, and the other half to Anna K. Paulson, being 26,548 shares to each.

"That first parties will assign, set over and transfer to second party 60,952 shares of the stock in said company out of the stock now held in trust for first parties or for said Anna K. Paulson by A. C. Flumerfelt, of Victoria, B. C., to wit: a block of 387,500 which with the said 26,584 shares shall constitute a part of said 225,000 shares.

"That the 187,500 shares of stock held in trust for second party by Alfred C. Flumerfelt under a trust deed dated February 14, 1903, less 50,000 shares already assigned to third persons by second party, shall be retained by second party as a part of said 225,000.

"That this agreement is in compromise, release and settlement of all claims and disputes of every character whatsoever between the parties, and especially in settlement of the suit now pending in the superior court for the county of Spokane, state of Washington, in which first parties are plaintiffs and second party is defendant, which, together with all matters litigated therein, are hereby settled and said suit shall be immediately dismissed, and this paper shall authorize the entry of an order dismissing the same.

"That the first parties shall have and own, free from any claim by second party, all the stock owned or claimed by each or both parties hereto in said company, except said 225,000 shares, and the various amounts herein provided to be paid to other parties."

At the time this last agreement was executed, Shults was in ignorance of the fact that Miner held 200,000 shares of the corporation stock to which he claimed no title, or that the Paulsons claimed that the stock so held belonged to them; indeed, he did not learn these facts until shortly prior to the time the present action was begun. Miner's purpose in taking the stock is not made very clear by the record, and is perhaps not material, but he seems to have desired it for the increased voting power it would give him while the business of the corporation was in the formative period.

In the briefs of counsel a number of questions have been suggested that we think merit no special consideration. In the main they relate to the admission or exclusion of evidence. We will notice, therefore, only those questions which we deem might have affected the result had a contrary ruling been made.

The deposition of plaintiff Miner was taken at Montreal, Canada, at the instance of the respondent, Shults, after Shults had filed an answer to the complaint. Between the time the deposition was taken and the time of the trial, Shults, by leave of court, amended his answer. At the trial the court allowed the deposition to be read over the objection of the plaintiff. This ruling of the court is assigned as error, but we think the ruling correct. While there is a difference in the phraseology of the two answers, and in the later one the respondent draws a somewhat different conclusion as to the equitable relation of the parties than he drew in the first, the facts alleged are substantially the same in both, and this is the only material inquiry. Moreover, the rule that excludes a deposition taken prior to the amendment of the pleadings, because new issues have been introduced by the amendments,

has not much force under our practice. The reason for the rule as usually stated is that it denies to the party the benefit of cross-examination, since he must necessarily confine his examination to the issues made by the pleadings. But such is not our practice. Here the opposing party may cross-examine on any fact brought out by the examination in chief, whether strictly within the issues or not. The practice has its foundation in our liberal statutes of amendments. A party may amend at any stage of the proceedings almost as of course, to make his pleadings correspond with his proofs, and the rule is just as applicable to a party whose proofs are by deposition as it is to one whose witnesses give evidence orally in open court. The cross-examiner must, therefore, be permitted to cross-examine upon the facts testified to in chief by the witness deposing, regardless of the form of the issues. The deposition offered in evidence shows that counsel fully availed themselves of the privilege in this instance.

It is next insisted that it was not competent to show by the witness Miner that the writing executed between the appellants and respondent on the one part and Flumerfelt on the other did not express the true agreement with reference to the sale of the shares of stock. On this point counsel say:

"We objected that any testimony of Mr. Miner tending to contradict, vary or modify the terms of the written contract was inadmissible, as all statements respecting the contract between the parties prior thereto and all oral understandings were merged in the written contract. We, of course, recognize the' fact that written contracts may be upset on account of fraud, accident or mistake. Accident or mistake is not charged, nor is fraud charged against the person who acquired title to the 1,400,000 shares of stock. Under the written contract, Flumerfelt or his principal, Miner, became the absolute and unqualified owner of 1,400,-000 shares of stock as soon as they had paid out the moneys named therein. That title and that ownership cannot be changed by one of the vendors who signed this contract (Shults) on the charge of fraud against a co-vendor,

unless he charges the vendee Miner or Flumerfelt with fraud. Not charging them with fraud, the terms of that written contract, in respect to the title and ownership in the vendee, cannot be varied or contradicted by parol testimony."

But this argument overlooks the fact that the pleading on the part of the respondent, Shults, purports to detail the transactions relating to the sale of the stock as they occurred, Miner's part therein and his motive for so acting, as well as that of the appellant Paulson. It is true that only the acts of the latter are characterized as fraudulent, but enough is alleged concerning Miner's acts to show that he had no right to retain the stock against the claim of Shults, and that while it was not perhaps the purpose of Miner to ultimately deprive Shults of his interest in the stock, his acts were fraudulent in that he had the purpose of wrongfully depriving Shults of their use for a more or less extended period of time. If, therefore, an allegation of fraud against Miner be necessary to admit the proofs objected to, the allegation is found in the pleading, as it is not necessary that a pleading allege fraud in direct terms; it being sufficient if the acts constituting the fraud are set forth. *Andrews v. King County*, 1 Wash. 46, 23 Pac. 409, 22 Am. St. 136; *Rathbone, Sard & Co. v. Frost*, 9 Wash. 162, 37 Pac. 298.

The findings of fact by the trial court we have outlined in our statement of the case. In the main, of course, they are undisputed; the only dispute being over the question whether the contract as written correctly recited the transaction concerning the number of shares of stock that were to be assigned to Miner. It is the appellants' contention that the writing did correctly express this contract. Their story of the transaction is that in all of the negotiations leading up to the execution of the writing, Miner insisted on an assignment to him of 1,400,000 shares of the capital stock of the corporation, to become his property on his performing the conditions recited in the contract; that while the business was under negotiation, the appellant Paul A. Paulson asked

Miner to make him a present of 200,000 shares of the stock in consideration of the hardship and trouble he had been to in locating and securing the claims; that Miner at that time would not consent to the proposition, "turned him down" as the witness expressed it; but after the contract was executed the subject was broached to him again, when he made a promise to assign the shares to Paulson. But without entering into a detailed analysis of the evidence opposing this contention, we think it abundantly justifies the conclusion of the trial judge. We think the evidence clear that the contract with Miner was made on a basis of 1,200,000 shares of stock, instead of 1,400,000 as the writing expresses it, and that the extra 200,000 shares was inserted in the writing at the request of Paul A. Paulson with the intent on his part to defraud Shults out of his interest in one-half thereof; that Miner knew of Shults' interest, but accepted the shares, nevertheless, because of the additional voting power in the corporation the shares would give him during the formative period of its business, intending finally to return them to the true owners.

But the appellant contends in this connection that the letter from Miner to Paul A. Paulson we have heretofore quoted constituted a declaration of trust entitling Paulson to recover the stock, notwithstanding there may have been no consideration for the declaration. But this contention is evidently founded on the claim that Miner acquired title absolute to the whole 1,400,000 shares described in the writing, and could make such disposition of them as he saw fit; but it is manifest that the contention is not tenable under the view of the facts found by the court and adopted by us here. One hundred thousand of the shares, under our view of the case, was never Miner's property to give away, and he could make no such binding promise concerning them as would deprive the true owner of his interests.

Again, it is contended that the title to the shares in dispute became the property of the appellants by the settlement

agreement of July 18, 1904, heretofore set out. The claim has its foundation in the last clause of the agreement. An examination of this clause will show that it is sufficiently broad to vest title in the appellants to the shares in question had there been no concealment of the facts from Shults by the appellants. But we think this act on their part prevents them from enforcing the contract. Shults, it will be remembered, had no knowledge at the time this agreement was entered into that he had any interest in the shares of stock now in question. He thought then that these shares belonged to Miner. The reason he did not know differently was because of the conduct and representations of the appellants. They had deceived him into the belief that the only remaining shares of stock of which they had ownership were the shares specifically described in the contract of settlement. To allow them now to assert to the contrary would be to allow them to take advantage of their own wrong, a thing not tolerated in a court of equity, especially where the effect of the wrong is to deprive another of his property.

There are cases, it is true, which hold that it is competent for a party by his own act to forego a recovery for unknown as well as known causes of action, but these are cases where the ignorance of the party held to be estopped was the result of his own fault or carelessness. We have found no case which holds the party estopped who has been induced to enter into a waiver of an unknown cause of action by the fraud and concealment of the other party to the contract of waiver. The question here falls within the latter class, and we think both equity and good conscience require that the injured party be not held estopped.

But it is urged that the appellants Paulson did not receive in the contract of settlement as many of the shares of stock as they were entitled to receive, if they are not permitted to retain the 100,000 shares in question here, and should now be permitted to litigate that question. But we are unable to find anything in the record that substantiates the fact here

assumed. No evidence was introduced or offered to that effect; on the contrary, it would appear from evidence concerning the settlement that the claim was not even considered an asset by the appellants. Even their counsel, who had in charge the settlement and knew all the facts, says that he "did not regard it as a legal claim or demand at that time; it was invisible." If this be true, it is difficult to understand why the appellants should surrender anything to the respondent in lieu of respondent's rights therein. But the record being silent as to any such controversy, the court would not order a rehearing in any event. The courts deal with real, not supposed, wrongs. A party will not be put to the burden of a trial until it is shown that there is an actual controversy.

The judgment appealed from will stand affirmed.

RUDKIN, C. J., GOSE, MORRIS, and CHADWICK, JJ., concur.